**THREESOME ENTERTAINMENT, et al., Plaintiffs,**

v.

**Jack STRITTMATHER, et al., Defendants.**

No. 1:98–CV–445.

United States District Court, N.D. Ohio, Eastern Division.

March 27, 1998.

James H. Banks, Dublin, OH, for Plaintiffs.

Kenneth S. Stumphauzer, Baumgartner & O'Toole, Lorain, OH, Alan E. Johnson, Leo R. Ward, Ward & Associates, Cleveland, OH, Abraham Lieberman, Lieberman & Nowak, New York City, for Defendants.

## OPINION & ORDER

O'MALLEY, District Judge.

The plaintiffs in this case are Robert Harris and his business, Threesome Entertainment (collectively, "Harris"). Harris brings this action against the following defendants: (1) the City of Vermilion, Ohio; (2) Vermilion's chief building inspector, Jack Strittmather; and (3) one or more unidentified "John Doe" defendants (collectively, "Vermilion"). Harris alleges that he owns and operates an adult cabaret in Vermilion called FantasyLand Lakeside, and that Vermilion has undertaken a series of improper actions directed at closing down his business. In his

complaint, Harris asserts that Vermilion: (1) illegally searched the premises of Fantasy-Land Lakeside without first obtaining a warrant; (2) refused to timely issue Harris an occupancy permit for FantasyLand Lakeside, even though Harris was entitled to one; and (3) generally conspired to shut down FantasyLand Lakeside. Harris asserts that Vermilion's actions work an unconstitutional infringement upon his freedom of expression, as guaranteed by the First Amendment.

Harris filed his complaint in this action on February 23, 1998. Subsequently, on March 5, 1998, Vermilion issued to Harris a temporary certificate of occupancy for the Fantasy-Land Lakeside. The next day, on March 6, 1998, Vermilion enacted Vermilion Codified Ordinance 98–15 (the "Ordinance"), as an emergency measure. This Ordinance regulates activities which may take place in "adult cabarets." Vermilion then notified Harris that it had passed the Ordinance, and granted Harris a one week period to comply. One week later, on March 13, 1998, Harris filed in this case a motion for temporary restraining order and preliminary injunction, seeking to prevent Vermilion from enforcing the Ordinance. The Court held a hearing on the same day and, for reasons stated on the record, granted the motion for temporary restraining order to maintain the status quo. This Order precluded Vermilion from enforcing any of the provisions contained in the Ordinance for ten business days, the last day being March 27, 1998.

The Court then held a hearing on Harris's motion for preliminary injunction on March 19, 1998. For reasons stated on the record at that hearing, and as explained more fully below, the Court modified its earlier temporary restraining Order to allow Vermilion to enforce some, but not all, of the provisions contained in the Ordinance. The Court further directed that the temporary restraining Order would continue in force until it expired by its own terms, or until the Court ruled on the motion for preliminary injunction, whichever occurred first.

The Court now rules on Harris's motion for preliminary injunction, which is **GRANTED IN PART AND DENIED IN PART.** Specifically, for the reasons stated below, the Court rules that Vermilion may not enforce the following provisions of the Ordinance because they are unconstitutional: § 666.18(b); § 668.18(c), to the extent it requires semi-nude employees to appear on a stage 45″ high; and § 666.18(f). Defendants *may* enforce all of the remaining sections of the Vermilion Ordinance.

### I. *Factual Background.*

The evidence presented at the preliminary injunction hearing is as follows. On February 17, 1998, Harris opened the FantasyLand Lakeside for business in Vermilion, Ohio. FantasyLand Lakeside serves non-alcoholic beverages and provides entertainment in the form of nearly-nude dancing women. The women dance on stage wearing a G-string, and their sole source of payment is tips from patrons. Besides tipping the women for dancing on stage, patrons may also pay women for a personal, close-up dance. These close-up dances are known as "lap dances" or "table dances."[1] During a lap dance, a dancer performs in close proximity to the patron; she may brush against him or put her hands on his[2] shoulders. A lap dance, which usually lasts between four and ten minutes (the duration of a dance song), may take place at the patron's table near the dance stage, or in the "VIP room." The VIP room is an area separated from the larger stage area by a curtain of beads, and offers a modicum of

---

1. As used in this opinion, a "lap dance" implies close proximity, but not sexual contact. *Compare Redner v. Dean*, 29 F.3d 1495, 1509 (11th Cir.1994), *cert. denied*, 514 U.S. 1066, 115 S.Ct. 1697, 131 L.Ed.2d 560 (1995) (finding unconstitutional a county ordinance that included the following provision: " 'Straddle dance' also known as a 'lap dance' or 'face dance', means the use by an employee, of any part of his or her body to touch the genital or pubic area of a person while at the establishment, or the touching of the genital or pubic area of any employee

with a person while at the establishment. It shall be a 'straddle dance' regardless of whether the 'touch' or 'touching' occurs while the employee is displaying or exposing any specified anatomical area. It shall also be a 'straddle dance' regardless of whether the 'touch' or 'touching' is direct or through a medium.").

2. The evidence suggested that patrons are invariably male, and dancers invariably female.

privacy. Several patrons may be in the VIP room at once, and managers and other employees can and do periodically view the interior of the VIP room; thus, Harris contends, the VIP room is not truly "private," it is merely less public than the stage area. A dancer will charge a patron about $5 for a lap dance in the stage area, and about $25 for a lap dance in the VIP room.

On its first day of operation, the Fantasy-Land Lakeside presented dancers in a state of total nudity. Since then, the dancers have worn G-strings, which cover their genitals; their buttocks and breasts remain uncovered. As noted, a dancer may come into contact with a patron during a lap dance, either intentionally or unintentionally. Harris testified, however, that this contact is not sexual—a dancer does not purposefully touch a patron with her breasts, or pubic area, and a dancer does not purposefully touch a patron's pubic area. Further, the patrons are explicitly directed not to touch the dancers in any way, and are warned that a failure to abide by this rule will result in an immediate termination of the lap dance, and possibly ejection from the premises. These rules are enforced by the dancers themselves and also by managers, who monitor the dancers, including during the times the dancers are in the VIP room.

Harris first opened the FantasyLand Lakeside for business on the evenings of February 17 and 18, 1998. These dates marked the first time any similar adult business had ever operated in Vermilion. On February 19, 1998, defendant Strittmather delivered to Harris a "cease and desist order," requiring Harris to cease operations for failure to obtain a certificate of occupancy. Harris indicated his intention to ignore the cease and desist order, so on February 20, 1998, Vermilion sought a temporary restraining order from the Lorain County Court of Common Pleas. Vermilion succeeded in obtaining the temporary restraining order from the state court, based on Harris's asserted failure to obtain an occupancy permit, so Harris closed the FantasyLand Lakeside on February 20, 1998. Harris then filed this action on February 23, 1998. On March 5, 1998, Vermilion issued a temporary occupan-cy permit to Harris, and Harris re-opened the FantasyLand Lakeside that day. On March 6, 1998, Vermilion dismissed its state court action.

During the time that Harris was not operating FantasyLand Lakeside by virtue of the state court temporary restraining order, Vermilion passed legislation directed at "prohibit[ing] certain activities in adult cabarets." Ordinance 98–15. The text of this Ordinance is attached to this opinion as Appendix A. Among other things, the Ordinance required: (1) dancers in adult cabarets to wear, at a minimum, pasties and a G-string; (2) that there be no physical contact between two dancers or between a dancer and a patron; (3) dancers to perform at a distance of at least six feet from any patron, and on a stage 45 inches high; and (4) patrons to present two forms of identification before entering an adult cabaret. The Ordinance is a criminal statute, ordaining that a person who violates any of its provisions "is guilty of a misdemeanor of the third degree." § 666.18(k).

Vermilion undertook the following procedure regarding adoption of the Ordinance. On March 2, 1998, at a meeting of the Vermilion City Council, there was a first reading of the Ordinance. Before this March 2 meeting, City Council members received three studies (one each done by New York City, Indianapolis, and Minnesota) regarding secondary effects of sexually oriented businesses. At the March 2 meeting, the City Council announced there would be a special meeting on March 4, 1998, to receive community comments about the Ordinance, and another special meeting on March 6, 1998, to consider enacting the Ordinance. Prior notice of the March 4 and March 6 meetings was sent to local newspapers, and was also broadcast on local cable television channels. At the March 4 meeting, several persons testified regarding the Ordinance, including Vermilion Police Chief Robert Kish. Kish stated that, according to the above-referenced studies and as revealed by data he had obtained from the nearby city of Brookpark, Ohio, criminal activity often increased near sexually oriented businesses. Before the March 6 meeting, at least one of the Council members also obtained a study by the Ohio

Department of Health regarding sexually transmitted diseases. This study showed that prostitution increases the transmission of sexual diseases.

At the March 6 meeting, the Ordinance was passed as an emergency measure. On March 7, 1998, Harris received a letter from Vermilion notifying Harris that the Ordinance was enacted and stating, "[y]ou are granted a time period of one week from the date of enactment of the ordinance to make the necessary arrangements to comply with Ordinance 98–15." After the week expired and enforcement was imminent, Harris filed his motion for a temporary restraining order, seeking to enjoin Vermilion's enforcement of the Ordinance.

## II. Preliminary Injunction Requirements.

A preliminary injunction is a provisional remedy authorized under Fed.R.Civ.P. 65. It is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, ——, 117 S.Ct. 1865, 1867, 138 L.Ed.2d 162 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948 at 129–130 (2d ed.1995)). When ruling on a motion for a preliminary injunction, "a district court must consider and balance four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Blue Cross & Blue Shield Mut. of Ohio v. Blue Cross & Blue Shield Ass'n*, 110 F.3d 318, 322 (6th Cir.1997).

"It is important to recognize that the four considerations applicable to preliminary injunctions are factors to be balanced and not prerequisites that must be satisfied. These factors simply guide the discretion of the court; they are not meant to be rigid and unbending requirements." *In re Eagle–Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir.1992). Thus, "the degree of likelihood of success required may depend on the strength of the other factors." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir.1985). "In general, the likelihood of success that need be shown (for a preliminary injunction) will vary inversely with the degree of injury the plaintiff will suffer absent an injunction." *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 105 (6th Cir.1982) (citation omitted).

 It is well-settled that the 'single most important prerequisite' is usually a demonstration that if preliminary injunctive relief is not granted, the applicant will suffer "irreparable harm." 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948.1 at 139 (2d ed.1995). "Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *Id.* at 153–54. The movant must show a presently existing actual threat. Only where the threatened harm would impair the ability to grant an effective remedy after trial is there a real need for preliminary relief. *Id.* at 149. Therefore, if a decision on the merits can be reached before actual injury would occur, there is no need for interlocutory relief. *Id.* Similarly, a preliminary injunction will usually be denied if it appears that the applicant has an adequate alternate remedy in the form of money damages or other relief. *Id.* at 149–51.

## III. Harris's First Amendment Rights.

In this case, Harris asserts the Ordinance infringes upon his First Amendment rights by prohibiting protected expressive activity. Specifically, Harris asserts that the Ordinance: (1) reduces his ability to present, through his dancers, an artistic and erotic message; and (2) restricts his patrons' ability to receive this message. Harris adds that the Ordinance will have an adverse economic effect on his business and his dancers, because the Ordinance makes it harder for his dancers to earn tips and could ultimately put his dancers and his operation out of business.

 Although nudity, per se, is not constitutionally protected conduct, *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 211 n. 7, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975), artistic dance does fall within the ambit of First

Amendment protection. *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 66, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981). Thus, if a dance is enhanced by nudity and the message conveyed is eroticism, the dance and erotic message are protected by the First Amendment. *Barnes v. Glen Theatre*, 501 U.S. 560, 581, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (Souter, J. concurring). Nude dance, however, falls on the outer fringes of First Amendment protection, and is afforded lesser protections than other types of speech, such as political speech. *Barnes*, 501 U.S. at 566, 111 S.Ct. 2456; *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 49, 106 S.Ct. 925, 89 L.Ed.2d 29 (1985); *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 70, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (plurality opinion) ("it is manifest that society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political speech").

That the right to engage in some nude, erotic dance is ensured by the First Amendment does not mean all nude dance is protected speech. The Sixth Circuit has interpreted *Barnes* "not to state that all similar activities are speech as a matter of law, but instead to leave open the possibility that on a different record, some activities may be not considered expressive at all." *DLS, Inc. v. City of Chattanooga*, 107 F.3d 403, 409 (6th Cir.1997). Nonetheless, as did the Court in *DLS*, this Court assumes that Harris's activities are expressive because he and his dancers seek to communicate "an endorsement of erotic experience." *Id.* Under this assumption, at least some of the provisions of the Ordinance do affect Harris's ability to communicate his message. For example, his endorsement of eroticism through presentation

of dancing women is necessarily affected by restrictions on the manner and method of that presentation, including the requirement that the message be conveyed at a minimum distance from its recipients.

 "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable harm." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Thus, Harris carries his burden of proof on the second factor regarding the propriety of injunctive relief. To a large degree, then, whether Harris is entitled to a preliminary injunction turns on whether he can show a substantial likelihood of success on the merits.[3]

### IV. Mode of Analysis.

 As a threshold matter, the Court must determine whether the Ordinance is aimed at suppressing Harris's specific erotic message, or instead is content-neutral. *See DFW Vending, Inc. v. Jefferson Cty., Texas*, 991 F.Supp. 578, 590–92 (E.D.Tex.1998) (noting that a different test applies in each case). If the Ordinance is aimed specifically at curbing Harris's speech, as Harris contends, then the Ordinance may be upheld only if it furthers a vital governmental interest by the least restrictive means. *Elrod v. Burns*, 427 U.S. at 361, 96 S.Ct. 2673. If, on the other hand, as Vermilion contends, the Ordinance is aimed only at curbing certain "secondary effects" of the protected expression, and not the protected expression itself, then the Ordinance may be upheld if it passes the less strict, four-part test enunciated in *United States v. O'Brien*, 391 U.S. 367, 376–77, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). *Barnes*, 501 U.S. at 566, 111 S.Ct. 2456. Under this test, an ordinance must: (1) be within the

---

**3.** In the context of this case, the Court finds that the third and fourth factors—whether issuance of the injunction would cause substantial harm to others, and whether the public interest would be served by issuance of the injunction—are considerably less important in the analysis of whether a preliminary injunction should issue. It is probably for this reason that the parties' arguments are directed exclusively to the second factor, likelihood of success on the merits. In any event, to the extent the Court finds a preliminary injunction enjoining certain provisions of the Ordinance is appropriate, the Court concludes that

the threatened First Amendment injury to Harris from allowing enforcement of these provisions outweighs the threatened injury to Vermilion and the public that an injunction may cause. *See T-Marc, Inc. v. Pinellas County*, 804 F.Supp. 1500, 1507 (M.D.Fla.1992) (making a similar, summary finding). Further, the Court finds that "the public interest [will] not be disserved by an injunction since the remainder of the ordinance [will] remain in full force and the [enjoined provisions] are not critical to achieve the desired purposes of the ordinance." *Id.*

constitutional power of the government; (2) further an important or substantial governmental interest; (3) provide an asserted governmental interest unrelated to the suppression of free expression; and (4) ensure that any incidental restrictions on alleged First Amendment freedoms is no greater than essential. *Id.* (citing *O'Brien,* 391 U.S. at 376–77, 88 S.Ct. 1673 ).

When a regulation focuses on particular speech—that is, when it seeks to suppress or regulate protected speech based on the "message it conveys"—the regulation is considered content-based. *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). On the other hand, so long as an ordinance is "justified without reference to the content of the regulated speech," or serves purposes unrelated to the content of the expression, it is deemed content-neutral. *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293–95, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). This remains true even if the regulation has an incidental effect on a particular category of speech. *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 48, 106 S.Ct. 925, 89 L.Ed.2d 29 (1984).

An ordinance can meet the content-neutrality requirement if it seeks to control only "secondary effects" related to protected expression, and not the protected expression itself. This conclusion emanates from the controlling holding of *Barnes v. Glen Theatre, Inc.,* 501 U.S. at 584, 111 S.Ct. 2456 (Souter, J. concurring) (recognizing "secondary effects as a sufficient basis for governmental regulation of sexually oriented businesses"). *See Triplett Grille, Inc. v. City of Akron,* 40 F.3d 129, 131–34 (6th Cir.1994) (discussing in detail the plurality and concurring opinions in *Barnes* and concluding that Justice Souter's "secondary effects" rationale embodied the Court's holding). Indeed, several courts have recognized and upheld regulations aimed at the undesirable secondary effects of sexually oriented businesses, despite the fact that these regulations infringed to some degree upon First Amendment freedoms. *See Renton,* 475 U.S. at 49, 106 S.Ct. 925 (upholding zoning ordinance regulating locations of adult movie theaters); *DLS, Inc.,*

107 F.3d at 411 (upholding ordinance regulating activity that may occur in adult cabarets and bookstores).

In this case, Vermilion seeks to regulate the activities that may occur inside all adult cabarets, irrespective of the message any dancers therein convey. The evidence shows that Vermilion's goals in enacting the Ordinance were to relieve the "secondary effects" associated with adult cabarets: increased prostitution, increased risk of transmission of sexually transmitted disease, increased crime, and increased risk of degeneration of the moral and social order. Because the ordinance can be enforced without reference to any message conveyed, it is content-neutral and should be evaluated as any other regulation that has an incidental effect on expressive conduct.

The record contains ample evidence supporting Vermilion's conclusion that it is legitimately targeting the asserted secondary effects. Vermilion Councilman Donald Flak testified that the purpose of the Ordinance is to promote and protect the public health, safety, and welfare, and not to suppress any constitutionally protected activities. Vermilion relied upon the findings of several other cities regarding the degree to which these secondary effects are associated with sexually oriented businesses. These findings indicated that sexually oriented businesses contribute to: (1) lower property values; (2) greater criminal activity, particularly sexual crimes; (3) prostitution; (4) drug crimes; (5) changed characteristics of neighborhoods (making them unappealing to families with children); (6) increased need for law enforcement to monitor and police sexually oriented businesses; (7) increased transmission of sexual disease, which threatens public health; and (8) disintegration of societal order and morality. Further, Vermilion Sheriff Kish presented testimony supporting Vermilion's claim that prostitution, disease, and crime are the true targets of the Ordinance.

Harris did not present substantial evidence that curbing the asserted secondary effects is not Vermilion's true objective, but rather a pretext to target Harris's free speech rights. Harris did argue that Vermilion may not be

sincere in claiming that the Ordinance targets undesirable secondary effects. As evidence of Vermilion's true intent, Harris points to the swift passage of the Ordinance and the fact no similar legislation existed until FantasyLand Lakeside opened. Harris suggests this timing, combined with Vermilion's "delay tactics" in providing an occupancy permit, shows Vermilion's true intent was to suppress Harris's speech and to prevent FantasyLand Lakeside from ever opening. The timing of Vermilion's Ordinance, however, is explained equally well by the city's desire to suppress the secondary effects. There was no need for legislation in Vermilion curbing secondary effects until an adult business actually opened in Vermilion. Once this primary source for the secondary effects arrived, the secondary effects could appear quickly. Thus, the timing and swiftness of the passage of the legislation does not, by itself, reveal any invidious intent. "That it took [Harris's] announced plans to spur [Vermilion] to [act] does not in any way impute illicit or unconstitutional motives to [Vermilion] city council." *D.G. Restaurant Corp. v. City of Myrtle Beach*, 953 F.2d 140, 146 (4th Cir.1991) (upholding ordinance regulating nude dancing). Further, Vermilion's alleged "tactic" of delaying the issuance of an occupancy permit required Vermilion to obtain the intervention of, and survive the scrutiny of, the Lorain County Court of Common Pleas. That Vermilion survived this scrutiny suggests it was acting legally. Thus, Vermilion's refusal to issue an occupancy permit does not cast Vermilion's passage of the Ordinance in a bad light.

Harris also suggests that the data contained in the studies relied upon by Vermilion is questionable, because it is outdated or comes from non-comparable cities. The Court must reject this argument because the Court cannot engage in ad hoc evaluations of legislative judgment. The judiciary is not a super-legislature wherein judges sit to "apprise the wisdom" of a municipality's discretion. *Renton*, 475 U.S. at 52, 106 S.Ct. 925 (quoting *American Mini Theatres, Inc.*, 427 U.S. at 71, 96 S.Ct. 2440). Vermilion's choice of whether it should rely upon one report over another is fully within legislative discretion; the Court need only conclude that a reasonable legislature would have enacted the challenged ordinance. *SDJ, Inc. v. City of Houston*, 837 F.2d 1268, 1274 (5th Cir. 1988), *cert. denied sub nom M.E.F. Enterprises v. City of Houston*, 489 U.S. 1052, 109 S.Ct. 1310, 103 L.Ed.2d 579 (1989). Moreover, "legislation seeking to combat the secondary effects of adult entertainment need not await localized proof of those effects." *Barnes*, 501 U.S. at 584, 111 S.Ct. 2456 (Souter, J., concurring); *Triplett*, 40 F.3d at 134 ("requiring affirmative evidence of a secondary effects motivation ... imposes a burden on the City that Justice Souter's opinion [in *Barnes*] seems designed to avoid"). It is not even necessary for municipal legislators themselves to actually review specific studies of secondary effects, so long as they receive recommendations from knowledgeable persons. *Lakeland Lounge of Jackson, Inc. v. City of Jackson, Miss.*, 973 F.2d 1255, 1258–59 (5th Cir.1992), *cert. denied*, 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 469 (1993). Further, a municipality may rely on studies from other cities as the basis of its own ordinance, so long as whatever evidence the municipality relies upon is "reasonably believed to be relevant to the problem" that it faces. *Renton*, 475 U.S. at 51–52, 106 S.Ct. 925; *see T-Marc, Inc. v. Pinellas County*, 804 F.Supp. 1500, 1503 (M.D.Fla.1992) (discussing the *Renton* standard). All that is required is that a "reasonable legislature with constitutional motives would have enacted the ordinance." *Lakeland Lounge*, 973 F.2d at 1259. A court should "not ask whether the regulator subjectively believed or was motivated by other concerns, but rather whether an objective lawmaker could have so concluded, supported by an actual basis for the conclusion. Legitimate purpose way be shown by reasonable inferences from specific testimony of individuals, local studies, or the experiences of other cities." *SDJ, Inc.*, 837 F.2d at 1274.

In sum, the Court concludes that Vermilion's legislators had a sufficient evidentiary basis before them upon which to conclude that the City faced the imminent arrival of the above-mentioned "secondary effects," which the Ordinance is designed to address. Further, the Ordinance on its face is aimed

only at curbing the "secondary effects" that are associated with adult cabarets, and not the protected expression communicated inside the cabarets. As such, the Ordinance may be upheld if it passes the *O'Brien* test for constitutionality of content-neutral ordinances.

## V. Application of the O'Brien Test to the Vermilion Ordinance.

As noted above, a content-neutral regulation that burdens expressive activity, or symbolic speech, such as the erotic dancing presented by Harris, must be gauged against the test of *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). *Barnes*, 501 U.S. at 566, 111 S.Ct. 2456; *Hang On, Inc. v. City of Arlington*, 65 F.3d 1248, 1254 (5th Cir.1995). This test states that a content-neutral ordinance survives constitutional challenge when: (1) it is within the constitutional power of the government; (2) it furthers an important or substantial governmental interest; (3) the asserted governmental interest is unrelated to the suppression of free expression; and (4) the incidental restrictions on alleged First Amendment freedoms is no greater than essential. *O'Brien*, 391 U.S. at 376–77, 88 S.Ct. 1673.

In this case, Harris relies solely on the fourth factor. Harris does not challenge the notion that protection of public health, safety, and welfare falls squarely within the constitutional police powers of local government. The Ordinance is clearly within Vermilion's police powers. *Barnes*, 501 U.S. at 567, 111 S.Ct. 2456 (public indecency statutes are "clearly within the constitutional power of the State"); *DLS, Inc.*, 107 F.3d at 410 ("the constitutional power of the [city] to enact this ordinance [regulating activity that may occur within adult cabarets] is not at issue"). There is also no question that prevention of crime and disease are important governmental interests, sufficient to satisfy the second prong of *O'Brien*, and that the Ordinance does further those interests. *DLS, Inc.*, 107 F.3d at 410 ("courts have repeatedly found

the prevention of crime and disease to satisfy this part of the *O'Brien* test") (citing *Barnes*, *Renton*, and *Triplett*); *BSA, Inc. v. King County*, 804 F.2d 1104, 1111 (9th Cir.1986) ("[c]urtailing public sexual contact and sexual criminal offenses represents a significant state interest"). Indeed, the prevention of degeneration of the social and moral order and the quality of life is also an important governmental interest which satisfies the second prong of *O'Brien*. *See Barnes*, 501 U.S. at 568, 111 S.Ct. 2456 (a city has a legitimate interest in "protecting societal order and morality"); *Renton*, 475 U.S. at 50, 106 S.Ct. 925 ("a city's 'interest in attempting to preserve the quality of urban life is one that must be accorded high respect'") (quoting *American Mini Theatres, Inc.*, 427 U.S. at 71, 96 S.Ct. 2440). Finally, Harris does not argue that the spread of disease and crime is integral to his expressive activity; Vermilion's interest in assuaging the targeted secondary effects is not directly related to suppression of protected speech.[4] "On its face, the governmental interest in combating prostitution and other criminal activity is not at all inherently related to expression." *Barnes*, 501 U.S. at 585, 111 S.Ct. 2456.

Thus, Harris's likelihood of success under an *O'Brien* analysis turns on the fourth factor—whether the Ordinance is no greater than essential to achieve Vermilion's objectives. As noted by Chief Justice Rehnquist, this test embodies substantially the same standards as a narrow tailoring analysis. *Barnes*, 501 U.S. at 566, 111 S.Ct. 2456. This factor (no greater than essential) does not mean "least restrictive means available." *Ward v. Rock Against Racism*, 491 U.S. at 798, 109 S.Ct. 2746. Rather, the Supreme Court has interpreted this requirement to mean "narrowly tailored" to further the government's interest. *Barnes*, 501 U.S. at 572, 111 S.Ct. 2456. As stated in *Ward*, "narrow tailoring is satisfied so long as the . . . regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation," and any resulting burden on speech is not substantially broader

---

4. Indeed, Harris adamantly asserts that he, too, is interested in guarding against the spread of disease and crime and that FantasyLand Lakeside is operated pursuant to strictly enforced rules, which he believes do serve that end.

than necessary to achieve the governmental goal. *Ward*, 491 U.S. at 897–99, 109 S.Ct. 2746. In distinguishing narrow tailoring from least intrusive means, the Supreme Court noted that a "regulation will not be invalid simply because a court concludes that the government's objective could be adequately served by some less-speech-restrictive alternative." *Id.*

Accordingly, the Court analyzes below each provision of the Ordinance for compliance with the fourth prong of the *O'Brien* test—whether the provision restricts First Amendment freedoms to a degree that is no greater than essential.

#### A. § 666.18(a)—No Complete Nudity or Fondling.

(a) No person shall knowingly or intentionally in an adult cabaret:

(1) Engage in sexual intercourse;

(2) Appear in a state of nudity in view of others;

(3) Fondle his or her own genitals in view of others; or

(4) Fondle the genitals of another person, or permit another person to fondle his or her genitals.

■ This first provision of the Ordinance is only at issue in this case to a limited extent. Harris has stated that he intends to comply with all except subsection (2) of this provision and that, as a practical matter, he is forced to comply with subsection (2) *in part*. Thus, it is undisputed that, except for the first day FantasyLand Lakeside was open (before the Ordinance was enacted), when Harris presented fully nude dancers, the dancers at FantasyLand Lakeside have worn G-strings, dancing topless rather than fully nude.[5] Because topless dancing would run afoul of the prohibition on "nude" dancing, this subsection of § 666.18(a) is clearly at issue. Because the parties' briefs address the constitutionality of the entire ordinance, moreover, the Court addresses § 666.18(a) in its entirety.

In conjunction with § 666.18(i) & (j), § 666.18(a) prohibits totally nude dancing—dancers must wear an opaque covering over their genitals, pubic area, and areola and nipple. The parties agreed that a dancer wearing a G-string and pasties meets this requirement of the Ordinance. The Supreme Court has upheld precisely such limitations before. In *Barnes*, the Supreme Court noted that "the requirement that the dancers don pasties and G-strings does not deprive the dance of whatever erotic message it conveys; it simply makes the message slightly less graphic." *Barnes*, 501 U.S. at 571, 111 S.Ct. 2456. The Supreme Court concluded that the "requirement that the dancers wear at least pasties and G-strings is modest, and the bare minimum necessary to achieve the State's purpose" of prohibiting "nudity in public places and among strangers." *Id.* at 572, 111 S.Ct. 2456. In light of this language in *Barnes*, it is clear that the ban on totally nude dancing contained in the Ordinance is not constitutionally infirm.

■ Regarding the prohibition in the Ordinance of fondling one's own or another's genitals, or engaging in sexual intercourse, Harris does not argue these prohibited actions implicate the First Amendment. While "[i]t is possible to find some kernel of expression in almost every activity a person undertakes," *City of Dallas v. Stanglin*, 490 U.S. 19, 25, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989), it is clear that the First Amendment does not protect any such kernel contained in the activities of sexual intercourse or fondling of genitals. This aspect of the Ordinance "is not a means to some greater end, but an end in itself"—prohibiting overtly sexual acts in public places. *Barnes*, 501 U.S. at 572, 111 S.Ct. 2456. Thus, there is no constitutional infirmity with the provisions of the Ordinance that prohibit fondling, either. *See Kev, Inc. v. Kitsap County*, 793 F.2d 1053, 1061 (9th Cir.1986) (upholding ordinance that prohibited dancers and patrons from "fondl[ing]" each other).

In sum, the court concludes that the provisions contained in § 666.18(a) of the Ordinance are narrowly tailored and do not

---

5. Harris admits he would offer all-nude dancing if he could, but states the dancers themselves generally refuse to dance without some covering below the waist.

restrict First Amendment freedoms to a degree more than is essential. Thus, Harris's motion to enjoin Vermilion's enforcement of those provisions is denied.

### B. § 666.18(b)—No Touching.

(b) No employee appearing on the premises of an adult cabaret in a state of semi-nudity shall have any physical contact with any other employee or with a customer of such adult cabaret.

This provision prohibits any dancer, while in a state of semi-nudity, from touching a patron, another dancer, or another employee of the adult cabaret.[6] Although Vermilion suggested, at the preliminary injunction hearing, that this provision was meant to prohibit only purposeful touching, the provision does not recite any requirement of a mens rea or scienter. *Cf.* § 666.18(a) (prohibiting a person from "knowingly or intentionally" appearing in a state of nudity).

 It is clear that "no-touch" provisions prohibiting *intentional* contact between erotic dancers and patrons in adult cabarets can be constitutional. *See, e.g., Hang On, Inc.*, 65 F.3d at 1253–54 ("[I]ntentional contact between a nude dancer and a bar patron is conduct beyond the expressive scope of the dancing itself. The conduct at that point has overwhelmed any expressive strains it may contain."); *Kev, Inc. v. Kitsap County*, 793 F.2d 1053, 1061 (9th Cir.1986) (upholding ordinance that prohibited dancers and patrons from "fondl[ing] or caress[ing]" each other). Critical to the holding in *Hang On, Inc.*, however, was the court's determination that the ordinance apparently was not designed to prohibit benign or non-sexual contact and did *not* prohibit "accidental or inadvertent touching," which would have

"burden[ed] more protected expression than is necessary to further the city's interest in preventing prostitution." *Hang On, Inc.*, 65 F.3d at 1254. The court noted that, even though the ordinance in question did not recite a culpable mental state, this silence was not fatal because, under Texas law, silence implicated a mens rea of at least recklessness. *Id.*

 Ohio law, however, does not provide the same presumption. Ohio courts have repeatedly stated that "when a statute reads 'no person shall' engage in proscribed conduct, absent any reference to a culpable mental state, the statute indicates a legislative intent to impose strict liability." *Ohio v. Shaffer*, 114 Ohio App.3d 97, 682 N.E.2d 1040, 1044 (1996), *appeal not allowed*, 77 Ohio St.3d 1543, 674 N.E.2d 1183 (1997). *See Ohio v. Cheraso*, 43 Ohio App.3d 221, 540 N.E.2d 326, 329 (1988) ("[i]t is well-established that when a statute reads, 'No person shall * * *,' absent any reference to the requisite culpable mental state, the statute is clearly indicative of a legislative intent to impose strict liability"). Given this rule of statutory construction, the provision that *"No employee ... in a state of semi-nudity shall have any physical contact with any other employee or with a customer of such adult cabaret"* imposes strict liability upon employees and patrons; liability is imposed regardless of the employee's or patron's scienter and regardless of the nature of the contact. (Emphasis added.) Thus, the provision criminalizes even inadvertent or accidental touching and could potentially criminalize a handshake or the handing over of money. As such, it cannot be said that the provision burdens no more protected expression than is necessary to further Vermilion's legitimate interests.[7]

---

**6.** Thus, a semi-nude dancer could not even shake hands with a patron. A semi-nude dancer also could not accept a glass of water from a co-employee if their hands touched in the exchange. And, ironically, under this Ordinance, a semi-nude dancer could not even push a customer away to rebuff an advance without subjecting herself to criminal charges.

**7.** In *DLS, Inc.*, the Sixth Circuit Court of Appeals upheld a Chattanooga, Tennessee provision ordaining that *"[n]o entertainer, employee or customer shall* be permitted to have any physical

contact with any other [sic] on the premises during any performance...." *DLS, Inc.*, 107 F.3d at 406 (quoting statute) (emphasis added). This ordinance contained no scienter requirement. The plaintiff in that lawsuit, however, did not challenge, and the Appellate Court did not analyze, the scienter aspect of the ordinance; rather, the plaintiff only challenged "the six-foot buffer zone requirement .. [and certain] procedural mechanisms for the issuance of licenses." *Id.* at 407. Thus, the holding of *DLS, Inc.* has no bearing on the Court's analysis of § 666.18(b).

The breadth of the language and lack of a mens rea requirement in § 666.18(b) may be merely a drafting oversight, but that oversight carries with it a legal significance and effect that causes the provision to be unconstitutionally overbroad. Moreover, the Court cannot "save" the Ordinance through a judicial construction, because a federal court cannot rewrite or provide a narrowing interpretation of a state regulation. *Gooding v. Wilson,* 405 U.S. 518, 520, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972) (federal courts cannot "construe legislation," and it does not matter that the conduct at issue could have been constitutionally prohibited "under a narrowly and precisely drawn statute"). Because § 666.18(b) of the Ordinance is not narrowly tailored, and does restrict First Amendment freedoms to a degree more than is essential, Harris's motion to enjoin Vermilion's enforcement of this provision must be granted.[8]

The Court notes, however, that the interests Vermilion seeks to advance with its "no-touch" provision contained in § 666.18(b) are, for all practical purposes, completely protected by the "buffer-zone" provision contained in § 666.18(c), which the Court addresses immediately below and finds is, for the most part, constitutional.

### C. § 666.18(c)—The Buffer Zone

(c) Any employee appearing on the premises of an adult cabaret in a state of semi-nudity must be on a stage that is at least forty-five inches (45") above floor level and that is removed at least six feet (6') from the nearest other employee and/or customer.

This provision creates a buffer zone between any dancer and any patron; to some extent, it is duplicative of the no-touch provision contained in § 666.18(b), as it is virtually impossible for a patron and dancer to touch each other when separated by a distance of six feet.

It is clear that, in general, a requirement of a buffer zone between dancers and patrons is constitutional. Several courts, including the Sixth Circuit Court of Appeals, have upheld ordinances with buffer zone requirements in the face of First Amendment challenges. *See DLS, Inc.,* 107 F.3d at 412 (6 foot buffer and 18 inch stage requirement); *Kev, Inc.,* 793 F.2d 1053, 1061 (9th Cir.1986) (10 foot buffer and 2 foot stage requirement); *BSA, Inc. v. King County,* 804 F.2d 1104, 1111 (9th Cir.1986) (6 foot buffer and 18 inch stage requirement); *Colacurcio v. City of Kent,* 944 F.Supp. 1470, 1477 (W.D.Wash. 1996) (10 foot buffer and 24 inch stage requirement); *T–Marc, Inc. v. Pinellas County,* 804 F.Supp. 1500 (M.D.Fla.1992) (3 foot buffer); *Zanganeh v. Hymes,* 844 F.Supp. 1087 (D.Md.1994) (6 foot buffer). As the Ninth Circuit Court of Appeals concluded, "[w]hile the dancer's erotic message may be slightly less effective from [six] feet, the ability to engage in the protected expression is not significantly impaired." *Kev, Inc.,* 793 F.2d at 1061; *see DFW Vending, Inc. v. Jefferson County,* 991 F.Supp. 578, 594 (E.D.Tex.1998) ("Six feet is sufficiently close for a person to view and appreciate an artistic dance performance. Indeed, that distance is closer than distances at which artistic dances at theaters and concert halls are gen-

---

8. When the Court, pursuant to its oral ruling following the preliminary injunction hearing, allowed Vermilion to enforce § 666.18(b), the Court was focused generally on whether a "no-touch" provision was constitutional and on Vermilion's representation that the provision did not prohibit benign touching; the Court did not then realize that, under Ohio law, the absence of a scienter element meant the provision applied even to inadvertent touching and that the language of the Ordinance is not as forgiving as Vermilion contended. But for the lack of a scienter requirement, the prohibition of sexual, extensive or even extended touching *between dancers and patrons* appears clearly constitutional. *Hang On,* 65 F.3d at 1253. For the same reasons, a prohibition of touching *between a dancer and another employee* at the adult cabaret, if it included a scienter requirement and did not sweep otherwise benign contact within its scope, would also almost certainly be constitutional. It is less clear whether a prohibition of non-overtly sexual touching *between two dancers while performing,* even if it included a scienter requirement, would also be constitutional; the Court has been unable to locate any case law addressing this specific question, which may implicate suppression of protected expression. In any event, the Court need not reach this question because the lack of a scienter requirement and the breadth of its language makes the entire provision constitutionally infirm, as to all of these types of touching.

erally viewed."). Although it is true that a patron's experience of the dancer's message "is more intense, more personal, more erotic if the dancer is close," it remains also true that "there is nothing in constitutional jurisprudence to suggest that patrons are entitled under the First Amendment to the maximum erotic experience possible." *Colacurcio*, 944 F.Supp. at 1476.

■ In this case, the Ordinance prescribes a buffer zone of six feet, and requires dancers to perform on a stage with an elevation of 45 inches. For the reasons stated in the above-cited cases, the Court finds there is no constitutional infirmity in the six-foot requirement. This condition is narrowly tailored and does not restrict First Amendment freedoms to a degree more than is essential. Thus, Harris's motion to enjoin Vermilion's enforcement of the six-foot requirement is denied.[9]

■ The 45–inch–high stage requirement is more problematic. This is so for the simple reason that the standard interior ceiling height for the vast majority of commercial buildings, including the FantasyLand Lakeside itself, is 96 inches (eight feet). Thus, the Vermilion Ordinance would require Harris, and anyone else wishing to operate an adult cabaret, to either: (1) hire dancers who can perform within the remaining 51–inch (four foot, three inch) vertical space; or (2) locate a building with higher-than-normal interior ceiling heights. The case law cited above makes it clear that it is constitutional for a city to impose *some* stage elevation requirement as a part of a buffer zone, but

the elevation requirement imposed in this case has the practical effect of virtually eliminating most commercial buildings as venues where persons can exercise their First Amendment right to present erotic dance.

At the preliminary injunction hearing, Vermilion recognized this problem and asked the Court to consider allowing Vermilion to enforce the provision only in buildings where ceiling heights did not make the provision oppressive. As noted previously, however, this Court cannot rewrite the ordinance or provide a narrowing interpretation of a state regulation. *Gooding v. Wilson*, 405 U.S. 518, 520, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972). Rather, the Court must determine whether the provisions of the Ordinance, *as written*, meet the *O'Brien* test. The Court concludes that the 45–inch requirement does not meet the last prong of this test.

The 45–inch stage height requirement, like the other provisions in the Ordinance, must be "narrowly tailored" to further the government's interest, meaning that any resulting burden on speech is not substantially broader than necessary to achieve the governmental goal. Here, the burden on speech imposed by the 45–inch stage height requirement is much broader than necessary, as the elevation requirement has the practical effect of prohibiting erotic dance from occurring at a considerable number of otherwise permissible locations. Moreover, there appears to be no measurable marginal benefit to Vermilion of requiring a 45–inch elevation, instead of a lower elevation which would not have this practical effect.[10] The

9. Harris also argued that the six-foot buffer zone will completely prevent his dancers from communicating through lap dances or collect tips while dancing on stage, which in turn will hurt his and his dancers' ability to earn income. Harris also argued that the six-foot buffer zone almost completely prevents him from using his VIP room for any purpose, because the VIP room is only six feet wide (but more than six feet long). These arguments are unavailing; indeed, they are irrelevant. As the Sixth Circuit noted,

> [t]he inquiry for First Amendment purposes is not concerned with economic impact. In our view, the First Amendment requires only that [Vermilion] refrain from effectively denying respondents a reasonable opportunity to open and operate an adult theater within the city.... [I]f the ordinance were intended to

destroy the market for adult cabarets, it might run afoul of the First Amendment, but not if it merely has adverse effects on the individual theater.

*DLS, Inc.*, 107 F.3d at 413 (quotation marks and citation omitted).

10. A lower elevation would almost certainly survive constitutional scrutiny, for the reasons cited in *DLS, Inc., Kev, Inc., BSA, Inc., Colacurcio, T–Marc, Inc.*, and *Zanganeh, supra*. Indeed, it would be difficult for Harris to argue that a reasonable stage elevation requirement infringes on his First Amendment rights, because a "platform only enhances visibility." *DFW Vending, Inc.*, 991 F.Supp. 578, 594.

Sixth Circuit noted that "it is probable that each marginal foot of [a] buffer zone achieves [the city's] goals somewhat less efficiently, [but] it is not for us to say that a seven-foot zone or a five-foot zone would strike a better balance." *DLS, Inc.*, 107 F.3d at 413. When the incremental distance effectively prohibits a "speaker" from conveying the message at all, however, the balance has been nullified into disequilibrium. If the Court were to permit Vermilion to enforce the 45–inch elevation requirement, Harris's "ability to engage in the protected expression [would be] significantly impaired." *Kev, Inc.*, 793 F.2d at 1061.

The choice of a 45–inch stage height for this Ordinance is also problematic because it may have been designed to ban adult cabarets (and most particularly FantasyLand Lakeside) from the marketplace. *Renton,* 475 U.S. at 50, 106 S.Ct. 925 (even if the ordinance serves a substantial governmental interest, it must "allow[ ] for reasonable alternative avenues of communication"). By virtue of the debate over the occupancy permit, Vermilion was familiar with the structure, dimensions and set-up of the facilities at FantasyLand Lakeside. Thus, Vermilion presumably was aware both that: (1) the ceilings at FantasyLand Lakeside were only eight feet high; and (2) FantasyLand Lakeside already had a twenty-four (24) inch stage. Given the extensive legal research Vermilion council members said they undertook, the City also had to have been aware that a twenty-four (24) inch stage height requirement had passed constitutional muster previously *and* had been deemed sufficient by many other communities to guard against the secondary effects of erotic dancing. Armed with this knowledge, Vermilion still chose to impose a 45–inch stage requirement, thereby arguably running afoul of the First Amendment. *See DLS, Inc.*, 107 F.3d at 413 (". . . [I]f the ordinance were intended to destroy the market for adult cabarets, it might run afoul of the First Amendment'.").

For all these reasons, the Court concludes, that the 45–inch elevation provision is not narrowly tailored and does restrict First Amendment freedoms to a degree that is more than essential. Thus, Harris's motion to enjoin Vermilion's enforcement of the 45–inch elevation requirement is granted.[11]

*D. § 666.18(d)—Employee Qualifications.*

(d) No person shall be an employee at an adult cabaret:

 (1) Who is not at least eighteen (18) years of age;

 (2) Who, within the past three (3) years, has been convicted of a felony; or

 (3) Who, within the past three (3) years, has been convicted of prostitution, procuring, pandering obscenity, violation of this section, or other crimes of a sexual nature.

■■■■ This provision places certain restrictions on those persons who may work at an adult cabaret. Essentially, the Ordinance prohibits minors and persons recently convicted of felonies or sex crimes from working at an adult cabaret. Vermilion states that these restrictions make it less likely that an adult cabaret will bring with it the secondary effects of prostitution, crime, moral depravity, and sexually transmitted disease.

The only aspect of § 666.18(d) that Harris seriously disputes is part (d)(2), which prohibits a person from working at an adult cabaret if he or she has been convicted of *any* felony. Harris argues this provision is substantially more broad than necessary because it would prohibit him from hiring even persons convicted of felonies completely unrelated to adult-oriented businesses—for example, selling a migratory bird.[12] Vermilion, however, notes that the Sixth Circuit Court

---

11. The Ordinance provides that "if any section, subsection or clause of this Ordinance shall be deemed to be unconstitutional or otherwise invalid, the validity of the remaining sections, subsections, and clauses shall not be affected." Ordinance at Section 2. Thus, the Court does not enjoin enforcement of the entirety of § 666.18(c), but only of that portion it finds unconstitution-

al—the clause providing that a semi-nude employee must appear "on a stage that is at least forty-five inches (45") above floor level."

12. *See* 16 U.S.C. § 707(b)(2) (making it a felony to sell a migratory bird).

of Appeals, in *DLS, Inc.*, upheld a virtually identical provision in a Chattanooga, Tennessee law. This law required all employees of adult-oriented businesses to: (1) be 18 years old; (2) not have been convicted of *any* felony, or *any* crime of moral turpitude in the last 5 years; and (3) not have violated the Chattanooga ordinance within the last five years. *DLS, Inc.*, 107 F.3d at 414 (setting out these requirements in the context of a licensing/permit scheme). The *DLS, Inc.* panel found that the Chattanooga ordinance survived First Amendment challenge because "it does not allow City officials to 'exercise discretion by passing judgment on the content of the protected speech,' and it sufficiently limits the discretion of the decisionmaker" as to whether the person may be employed. *Id.* (citations omitted).

The same is equally true in this case. These provisions do not have the effect of completely prohibiting Harris from presenting semi-nude dancers, they only regulate whom he may employ. These regulations only restrict him from employing minors and persons with recent criminal backgrounds, not from communicating his desired message. Because these provisions are narrowly tailored and do not restrict First Amendment freedoms to a degree more than is essential, Harris's motion to enjoin Vermilion's enforcement of the employee qualification requirements is denied.[13]

### E. § 666.18(e)—Patron Identification Documents.

(e) No person under the age of eighteen (18) years shall be permitted on the premises of an adult cabaret. To ensure that there is no violation of this subsection, there shall at all times during the hours that such adult cabaret is open for business be stationed at each entrance to the adult cabaret an employee who shall require of each person seeking admittance two identification documents. At least one of the identification documents must be either a current driver's license or state-issued identification card, and in either case must contain the full name, birth date and photograph of the holder.

■■■ This provision requires any patron of an adult cabaret to be 18 years old, and to prove this by presenting two forms of identification—one of them a "picture ID." The second identification document can be simply a credit card identifying the patron by name.

Harris complains that this provision is excessive because: (1) it requires patrons to produce more than one form of identification document, when one is enough; (2) it requires even patrons who are obviously well over 18 years old to produce documentation; and (3) the result is that patrons are deterred from entering the cabaret and receiving the message he and his dancers wish to communicate. As with the other sections of the Ordinance that Harris challenges, the deciding question under the *O'Brien* test is whether the provision requiring two identification documents is narrowly tailored to further the government's interest, meaning that it "promotes a substantial governmental interest that would be achieved less effectively absent the regulation," and any resulting burden on speech is not substantially broader than necessary to achieve the governmental goal. *Ward*, 491 U.S. at 799–800, 109 S.Ct. 2746.

In this case, it is clear that Vermilion could further its legitimate governmental interest of preventing minors from entering an adult cabaret with a less oppressive regulation than the one contained in the Ordinance—a "picture ID," alone, would do. But a "regulation will not be invalid simply because a court concludes that the government's objective could be adequately served by some less-speech-restrictive alternative." *Id.* So long as the Ordinance does not restrict the broadcast and receipt of protected speech "substantially broader than necessary," the Ordinance is constitutional. The Court concludes that the identification documents provision of the Ordinance meets this standard.

---

13. Like § 666.18(b), § 666.18(d) reads "no person shall," and contains no reference to a culpable mental state. This does not create any constitutional problem, however, because a person cannot be 18 years old, or have a recent conviction of a felony or a crime of a sexual nature, without knowledge of that fact. Thus, unlike § 666.18(b), § 666.18(d) does not criminalize inadvertent behavior, and therefore is not substantially broader than necessary.

The provision calls for patrons to produce one "picture ID" and one additional identification document, which need not be a picture ID. Harris objects that the requirement of the additional identification document is "substantially broader than necessary." The Court finds, however, that this additional identification requirement does not significantly increase the restriction of Harris's ability to communicate his message, or unduly restrict Harris's prospective patrons from hearing that message. The additional identification requirement may be met by merely producing a credit card, or even a business card. Although the additional identification requirement does not significantly further the government's legitimate interest in preventing corruption of minors, the test is not whether Vermilion has chosen the least restrictive means possible to advance its interests. Rather, the test is merely whether Vermilion has tailored its Ordinance with sufficient narrowness so as not to burden protected speech substantially more than is necessary. Because Vermilion passes this test, Harris's motion to enjoin Vermilion's enforcement of the identification document requirements is denied.[14], [15]

*F. § 666.18(f)—Operator Qualifications.*

(f) No person shall operate or participate in the operation of an adult cabaret that violates any provision of subsection (a), (b), (c), (d) or (e) hereof.

14. Regarding Harris's argument that the provision is substantially broader than necessary because it requires even septuagenarians to produce proof of age, the Court disagrees that this admittedly inflexible requirement rises to the level of constitutional infirmity. Further, the Court is unwilling to draw the necessarily subjective line between persons of questionable majority and persons who obviously are not minors; Vermilion's bright-line rule that all patrons must present identification documents is not excessive. Finally, regarding Harris's argument that the identification document requirements deter patrons from entering his cabaret, the Court again concludes that any deterrent effect (of which Harris submitted no evidence) creates only an economic problem, not a constitutional one.

15. The "no person shall" language contained in § 666.18(e) presents no problem, for the same reason this language presented no problem in connection with § 666.18(d). See footnote 13,

■ Primarily, this provision insists that an *operator* of an adult cabaret must ensure compliance with the other provisions contained in the Ordinance. The plain language of the provision, however, also places restrictions upon persons who "participate in the operation of an adult cabaret." Thus, the provision may be read to apply to a manager and even any other employee, each of whom may be construed to "participate in the operation" of the business. Notably, like § 666.18(b), this provision does not include any element of mens rea or scienter.

The Court finds that this provision is problematic for two reasons. First, because of the lack of a scienter requirement, this provision would criminalize an owner's operation of an adult cabaret if the owner employed a dancer who had been convicted of prostitution within the last three years,[16] *even if the owner had no reason to know of the dancer's conviction.* Similarly, an owner would be criminally liable if an employee failed to wear the required pasties, even if the employee did so in violation of the operator's orders, without the advance knowledge of the operator, and only for a brief period prior to being told to stop by the operator. This result would ensue because the regulation does not require knowledge of a violation or even of the possibility of a violation on the part of the owner. Thus, even though Harris requires each of his dancers to fill out an employment application that asks about their criminal history and informs all dancers of the rules they

above. The language in § 666.18(e) does not create any constitutional problem because a person cannot be under 18 years of age without knowledge of that fact. Thus, unlike § 666.18(b), § 666.18(e) does not criminalize inadvertent behavior, it simply imposes a penalty on a minor who enters an adult cabaret and on a business owner who fails to seek and review at least two forms of identification. The Court does not read this provision to impose a criminal penalty on a business owner who admits an underage patron if that patron has falsely provided the two forms of identification required by the Ordinance. The Court's decision regarding § 666.18(f), below, guards against the possibility that the criminal penalties under this provision will sweep too broadly.

16. See § 666.18(d)(3) ("No person shall be an employee at an adult cabaret ... [w]ho, within the past three (3) years, has been convicted of prostitution").

must follow, Harris could be liable under § 666.18(f) if a dancer lies on her application and Harris hires her, or otherwise violates the Ordinance without notice to Harris.

As noted above, under Ohio law, "when a statute reads 'no person shall' engage in proscribed conduct, absent any reference to a culpable mental state, the statute indicates a legislative intent to impose strict liability." *Ohio v. Shaffer*, 682 N.E.2d at 1044. Given this rule of statutory construction, the provision that "*No person shall* operate or participate in the operation of an adult cabaret that violates any provision of subsection (a), (b), (c), (d) or (e) hereof imposes strict liability upon operators of adult cabarets, regardless of the operator's scienter." (Emphasis added). Thus, the provision would criminalize an owner's conduct even if he took every precaution to ensure his cabaret was being operated in conformity with the Ordinance, but an employee or patron violated the Ordinance without his knowledge. As such, it cannot be said that the provision burdens no more protected expression than is necessary *to further Vermilion's legitimate interests.* Because § 666.18(f) of the Ordinance is not narrowly tailored to ensure a person can only be found criminally liable for a knowing [17] violation, and thus does restrict First Amendment freedoms to a degree more than is essential, Harris's motion to enjoin Vermilion's enforcement of this provision must be granted.

The second problem with § 666.18(f) is that it imposes criminal penalties upon not only an owner or manager of an adult cabaret who operates the business in violation of the Ordinance, but upon any employee who "participate[s] in the operation of an adult cabaret that violates" the Ordinance. Under the plain language of the regulation, therefore, an otherwise innocent dancer could be

found liable under the Ordinance if a manager fails to obtain two identification documents from a patron, because the dancer "participates in the operation" of an adult cabaret that has violated § 666.18(e). Vermilion may not have intended that the Ordinance work to impose such vicarious liability, but the broad language of the regulation allows for this result. Because the language is so broad, the Court must conclude for this additional reason that § 666.18(f) of the Ordinance is not narrowly tailored, and thus does restrict First Amendment freedoms to a degree more than is essential. For this additional reason, Harris's motion to enjoin Vermilion's enforcement of this provision must be granted.[18]

### G. § 666.18(g–k)—Definitions and Penalties.

The remaining provisions contained in § 666.18 define certain terms (e.g., "nudity" and "employee") and set out the penalty for violation of the Ordinance. Harris does not complain that these provisions are unconstitutional, and the Court finds no constitutional infirmity. Accordingly, Harris's motion to enjoin Vermilion's enforcement of these provisions is denied.

### H. The Method of Passage of the Ordinance

In some of the documents he has filed with the Court, Harris suggested that Vermilion did not follow the required procedures when it enacted the Ordinance. Both Harris and Vermilion offered evidence at the preliminary injunction hearing regarding whether the procedures Vermilion followed complied with Ohio Rev.Code § 121.22, which is a "Sunshine Law" requiring advance notice of public meetings, and Article III of Vermilion's City Charter, which governs enactment of

---

**17.** A mens rea of purpose, knowledge, or recklessness *would probably be sufficient. Hang On, Inc.,* 65 F.3d at 1254.

**18.** Here again, the Court notes that, but for the lack of a scienter requirement in § 666.18(f), the prohibition of an *owner or manager* (as opposed to anyone who participates in the cabaret's operation) from operating an adult cabaret in violation of the Ordinance appears constitutional. For example, just as it is constitutional to prohib-

it a dancer from appearing fully nude (see discussion of § 666.18(a)(2) in *section* V.A of this opinion), and to prohibit dancers from dancing within six feet of patrons (see discussion of § 666.18(c) in section V.C of this opinion), it is constitutional to prohibit an owner of an adult cabaret from *knowingly allowing* a dancer to appear fully nude or to dance within six feet of a patron.

ordinances. Along with the other requirements discussed above, to pass the *O'Brien* test, an ordinance must be "lawfully enacted." *D.G. Restaurant Corp.*, 953 F.2d at 145 (citing *O'Brien*).

Although both parties presented this evidence, Harris more than once stated at the preliminary injunction hearing that, with his motion for preliminary injunction, he was *not* challenging the Ordinance on these grounds. Transcript at 1–3. Accordingly, the Court does not reach the question of whether Vermilion enacted the Ordinance in compliance with state and local law, and thus does not enjoin the enforcement of any portion of the Ordinance on that basis.

**IT IS SO ORDERED.**

### *Appendix A: Vermillion Ordinance No. 98–15*

**AN ORDINANCE ADDING SECTION 666.18 TO THE CODIFIED ORDINANCES OF THE CITY OF VERMILION TO PROHIBIT CERTAIN ACTIVITIES IN ADULT CABARETS; AND DECLARING AN EMERGENCY.**

**WHEREAS,** based on the experience of the City of Vermilion and other cities, and on studies of adult entertainment businesses reviewed by members of Council, Council of the City of Vermilion finds that the presence of adult cabarets that feature nude or semi-nude entertainment has significant adverse secondary effects, including an increase in prostitution and other criminal activities and the spread of disease; and

**WHEREAS,** in order to minimize and control such adverse effects, Council of the City of Vermilion deems it in the interests of the City to regulate such adult cabarets by prohibiting certain activity therein.

**NOW, THEREFORE, BE IT ORDAINED** by the Council of the City of Vermilion, Counties of Erie and Lorain, State of Ohio:

*SECTION 1:* That the following Section 666.18 be created and added to the Codified Ordinances of the City of Vermilion:

**666.18 CONDUCT PROHIBITED IN ADULT CABARETS**

(a) No person shall knowingly or intentionally in an adult cabaret:

 (1) Engage in sexual intercourse;

 (2) Appear in a state of nudity in view of others;

 (3) Fondle his or her own genitals in view of others; or

 (4) Fondle the genitals of another person, or permit another person to fondle his or her genitals.

(b) No employee appearing on the premises of an adult cabaret in a state of semi-nudity shall have any physical contact with any other employee or with a customer of such adult cabaret.

(c) Any employee appearing on the premises of an adult cabaret in a state of semi-nudity must be on a stage that is at least forty-five inches (45") above floor level and that is removed at least six feet (6') from the nearest other employee and/or customer.

(d) No person shall be an employee at an adult cabaret:

 (1) Who is not at least eighteen (18) years of age;

 (2) Who, within the past three (3) years, has been convicted of a felony; or

 (3) Who, within the past three (3) years, has been convicted of prostitution, procuring, pandering obscenity, violation of this section, or other crimes of a sexual nature.

(e) No person under the age of eighteen (18) years shall be permitted on the premises of an adult cabaret. To ensure that there is no violation of this subsection, there shall at all times during the hours that such adult cabaret is open for business be stationed at each entrance to the adult cabaret an employee who shall require of each person seeking admittance two identification documents. At least one of the identification documents must be either a current driver's license or state-issued identification card, and in either case must contain the full name, birth date and photograph of the holder.

(f) No person shall operate or participate in the operation of an adult cabaret that

violates any provision of subsection (a), (b), (c), (d) or (e) hereof.

(g) As used in this section, "adult cabaret" means a commercial establishment that features persons who appear in a state of semi-nudity and which is intended to arouse or gratify the sexual desires of the operator, entertainer, employee or customer, including exotic dancers, strippers, male or female impersonators, or semi-nude waiters, waitresses or bartenders, or similar entertainers.

(h) As used in this section, "employee" means a person who performs any service or work on the premises of an adult cabaret, including but not limited to providing entertainment, performing work of a management or supervisory nature, or performing support functions, on a full-time, part-time or contract basis, whether or not the person is denominated an employee, independent contractor, agent or otherwise and whether or not such person is paid a salary, wage or other compensation by the operator of such business. "Employee" does not include a person on the premises exclusively for repair or maintenance of the premises or equipment on the premises, or for the delivery of goods to the premises.

(i) As used in this section, "nude" or "nudity" means exposing to view the human male or female genitals or pubic area with less than a fully opaque covering, the showing of the female breast below a point immediately above the top of the areola with less than a fully opaque covering of the areola and nipple, or the showing of the covered male genitals in a discernibly turgid state. "Covering" means any clothing or wearing apparel, including pasties, but does not include any substance that can be washed off the skin, such as paint or make-up, or any substance designed to simulate the appearance of the anatomical area beneath it.

(j) As used in this section, "semi-nude" or "semi-nudity" means exposing to view, with less than a fully opaque covering, any portion of the human female breast below the top of the areola or any portion of the buttocks. This definition shall include the entire lower portion of the female breast, but shall not include any portion of the cleavage of the female breast exhibited by a dress, blouse, shirt, leotard, bathing suit or other clothing, provided that the areola is not exposed in whole or in part.

(k) Whoever violates any provision of this section is guilty of a misdemeanor of the third degree, and shall be subject to the penalty provided in Section 698.02.

**SECTION 2:** That if any section, subsection or clause of this Ordinance shall be deemed to be unconstitutional or otherwise invalid, the validity of the remaining sections, subsections, and clauses shall not be affected.

**SECTION 3:** That this Council finds and determines that all formal actions of this Council concerning and relating to the passage of this Ordinance were taken in an open meeting of this Council, and all deliberations of this Council and of any committees that resulted in those formal actions were in meetings open to the public in compliance with the law.

**SECTION 4:** That this Ordinance is hereby declared to be an emergency measure necessary for the immediate preservation of the public peace, health and safety of the City for the reasons set forth above; and provided it receives the majority vote of two-thirds or more of those elected to City Council, it shall go into full force and effect from and immediately after its passage and its approval by the Mayor; otherwise it shall take effect at the earliest period allowed by law.